This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, John David Smith, appeals his conviction in the Wayne County Court of Common Pleas. We affirm.
 I.
On August 30, 2000, the Wayne County Grand Jury indicted Mr. Smith on one count of aggravated murder, in violation of R.C. 2903.01. The deceased was Mr. Smith's ex-wife, Janice Elaine Hartman Smith ("Janice"), who disappeared in November of 1974. On April 2, 2001, the state expressed its intention to introduce evidence concerning the disappearance of Mr. Smith's second wife, Betty Fran Smith, (hereinafter referred to as the "New Jersey Evidence"), pursuant to Evid.R. 404(B). After a hearing on the matter, the trial court issued an order on May 31, 2001 prohibiting the introduction of the New Jersey Evidence. A jury trial was held, commencing on July 2, 2001. In a verdict journalized on July 19, 2001, the jury acquitted Mr. Smith of aggravated murder but found him guilty of the lesser offense of murder, in violation of R.C.2903.02. Mr. Smith was sentenced accordingly.
On July 20, 2001, Mr. Smith moved for a new trial, pursuant to Crim.R. 33(A)(1). In his motion, Mr. Smith argued that a new trial was warranted because State's Exhibit 48 contained a reference to evidence previously deemed inadmissible by the court, namely the New Jersey Evidence. According to Mr. Smith, this portion of the exhibit was inadvertently admitted without objection by the defense. On July 26, 2001, the state responded in opposition. Mr. Smith filed a reply to the state's response on August 16, 2001 and supplemented his reply on September 6, 2001. On September 18, 2001, the trial court denied Mr. Smith's motion for a new trial. This appeal followed.
 II
Mr. Smith asserts nine assignments of error for review. We will discuss each in due course, consolidating the sixth and ninth assignments of error to facilitate review.
 A. Sixth Assignment of Error "APPELLANT SMITH'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF THE FOURTEENTH AMENDMENT, UNITED STATES CONSTITUTION; ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION."
 Ninth Assignment of Error "THE TRIAL COURT ERRED IN DENYING APPELLANT SMITH'S MOTION FOR ACQUITTAL BECAUSE THE STATE FAILED TO PROVE THE CORPUS DELICTI, VIOLATING THE OHIO CONSTITUTION'S ARTICLE I, SECTION 16, AND THE 14TH AMENDMENT DUE PROCESS CLAUSE."
In his sixth and ninth assignments of error, Mr. Smith avers that the trial court erred in denying his Crim.R. 29(A) motion for acquittal, as the state failed to adduce sufficient evidence to establish the corpus delicti of the crime and the essential elements of murder. We disagree.
Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." When reviewing the legal sufficiency of the evidence to support a criminal conviction, "`the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (Emphasis omitted.) State v. Herring, 94 Ohio St.3d 246, 252,2002-Ohio-796, quoting Jackson v. Virginia (1979), 443 U.S. 307, 319,61 L.Ed.2d 560. In conducting this review, an appellate court does not weigh the evidence but, rather, determines whether reasonable minds could reach the trier of fact's conclusion. State v. LaMar, 95 Ohio St.3d 181, 197,2002-Ohio-2128. "The weight and credibility of the evidence are left to the trier of fact." State v. Waddy (1992), 63 Ohio St.3d 424, 430, citingState v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
"In a criminal prosecution, a plea of `not guilty' requires the state to prove all material facts relating to the crime charged, including those facts relating to the corpus delicti." State v. Manago (1974),38 Ohio St.2d 223, 226. Mr. Smith was found guilty of murder, in violation of former R.C. 2903.02(A), which provides that "[n]o person shall purposely cause the death of another." "A person acts purposely when it is his specific intention to cause a certain result[.]" R.C.2901.22.
The corpus delicti of murder involves: "`(1) the fact of death and (2) the existence of the criminal agency of another as the cause of death.'"State v. Nicely (1988), 39 Ohio St.3d 147, 151, citing Manago, 38 Ohio St.2d at paragraph one of the syllabus. The purpose of the corpus delicti is simply to establish that the crime occurred. State v. Van Hook
(1988), 39 Ohio St.3d 256, 262. Significantly, circumstantial evidence alone may be sufficient to establish the essential elements of the crime charged as well as the corpus delicti of the crime. Nicely, 39 Ohio St.3d at paragraphs one and two of the syllabus.
At trial, during the state's case-in-chief, there was evidence presented that Janice, born March 2, 1951, married Mr. Smith shortly after their high school graduation when they were nineteen years old. The newly married couple moved to Columbus, Ohio, where they lived for approximately one and a half to two years. Gary Hartman ("Gary"), Janice's brother, testified that, when he went to visit Janice in Columbus, there was a domineering type of situation when Mr. Smith was present.
Both Janice's mother, Betty Lippincott, and Gary recounted incidents during which Mr. Smith's temper flared. Betty Lippincott testified that Mr. Smith berated her and Janice for not being able to prepare anything but soup and sandwiches, while Gary related that Mr. Smith threw a chessboard against the wall after losing a game to him.
According to Betty Lippincott, Janice called her from Columbus to inform her that she was divorcing Mr. Smith. Betty Lippincott described Janice as angry and upset during the telephone conversation. Sometime thereafter, in 1974, Janice returned to Wayne County, Ohio. For approximately one week, she lived with her father in Doylestown. In the Fall of 1974, Mr. Smith moved back to Wayne County, and, at the time of Janice's disappearance, it appears that Janice and Mr. Smith were living together in a trailer home in Wayne County. While living in Wayne County, Janice worked as a go-go dancer at a local establishment. She also served as a police informant on drug-related matters.
On November 10, 1974, Janice was physically attacked, sexually assaulted, and threatened. In a police report filed shortly after the incident, Janice described what had occurred. Janice stated that, while at the Portage Pub in Doylestown, she and her date, Leonard Bennett, were invited by a blond-haired man to a party at Larry Swaine's house. While at Larry Swaine's residence, a man threw her to the floor, removed her clothing, dragged her into the bedroom, and attempted to have sexual intercourse with her. According to Janice, the man told her that "[b]itches like you don't deserve to live." At that point, several other men entered the bedroom and held Janice down. She stated that she struggled and was struck in the face. Others attempted to engage in sexual relations with her. At some point, the blond-haired man came into the room with a loaded shotgun, pointed it at Janice, and said, "[n]arcs always have an easy way out." Another man shouted not to kill Janice, and Leonard Bennett and Janice were eventually released.
On November 14, 1974, the dissolution of Janice and Mr. Smith's marriage was finalized. Janice disappeared three days later on November 17, 1974. According to Deputy Sheriff Thomas L. Gasser of the Wayne County Sheriff's Department, on November 19, 1974, Mr. Smith filed a missing person report. In that report, Mr. Smith listed his wife, rather than ex-wife, Janice, as missing. According to the report, Mr. Smith had last seen Janice on November 17, 1974 with a stocky man who had a mustache at the Sun Valley Inn, a local tavern. Kathy Peridon, who was present when Mr. Smith made the report, confirmed that Janice had been at the Sun Valley Inn and that Janice dropped her off at her home. Kathy Peridon told the officer that Janice then left with the other occupant of her vehicle, a man.
In the report, Mr. Smith told Officer Gasser that Janice was wearing her wedding and engagement rings and a diamond watch. Additionally, Mr. Smith advised that, because Janice's beloved Mustang was parked at their trailer, Janice must have returned home in the early morning hours of November 18, 1974 and left before he woke, possibly to file charges against certain individuals.
Betty Lippincott testified that, although Mr. Smith had frequently contacted her before Janice's disappearance, he never called her to ascertain whether Janice had been located.
At trial, Michael Smith ("Michael"), the defendant's younger brother, testified that Janice had told him that she and Mr. Smith were getting along better after they decided to terminate their marriage and that Mr. Smith really loved Janice. Michael said that he learned about Janice's disappearance from Mr. Smith. At that time, Mr. Smith told him that Janice was going into a witness relocation program because she was a drug informant. Subsequently, Michael helped Mr. Smith pack some of Janice's belongings at the trailer and transport them to their grandparents' garage in Seville, Ohio. The grandparents, the Chaneys, owned a Marathon filing station, and, although they sold gas, they no longer used the garage for business purposes.
Michael testified that, during the Ohio State-Michigan football game, which was played around the Thanksgiving holiday, he went to the garage to find out why Mr. Smith was not watching the football game as he had in the past. Michael found his brother building a wooden box out of plywood. In response to a question, Mr. Smith stated that he was building a box in which to store some of Janice's belongings. Michael testified that the box was long and skinny, approximately eight inches high, sixteen inches wide, and four feet long. According to Michael, when he informed Mr. Smith that the dimensions of the box were strange for storing things, Mr. Smith became angry and said nasty things, so Michael left.
Michael related that he finished watching the Ohio State game and the following football game before returning to the garage. When Michael went to the garage the second time, Mr. Smith had completed the box and was rolling up (not folding) Janice's clothes and tucking them around the edges of the box. Michael described his brother as visibly upset, almost to the point of crying. Afterwards, he saw the box sitting on the north part of the east wall of the garage with some of Janice's other belongings. Michael stated that the box stayed there a few years but was eventually relocated to the south part of the garage, where it remained until June of 1979.
In June of 1979, when he went home on his lunch break, his grandfather who was panicked came up to him, explaining that he had partially opened the box. When Michael looked at the box, he could not tell what was inside but told his grandfather that he would get rid of it. He took the box behind his house and completely pried open the box and discovered a human skeleton that had the legs sawed off just below the knee. Michael believed that the remains belonged to Janice. Instead of calling the police, Michael called his brother in Hammond, Indiana and informed him that he had opened and looked inside the box. According to Michael, Mr. Smith said that he would be right there, arrived that night, and picked up the box.
Joseph Dabrowski, Mr. Smith's coworker at Copco Industries, testified that, in June of 1979, Mr. Smith left work early one Friday purportedly to do some business in Seville, Ohio, and returned on Tuesday of the following week.
While his brother was picking up the box in Seville, Michael asked him for an explanation. According to Michael, Mr. Smith told him that two men drugged him and took him to a warehouse. When he woke, Janice was dead on the floor, and an FBI agent and a Wayne County Sheriff threatened to frame him for murder. At that point, Mr. Smith was rendered unconscious again and returned to his trailer. In his trailer, he found Janice dead on the floor. Michael testified that his brother then told him that he threw Janice in his van and quickly left but noticed a Wayne County Sheriff pulling up to his trailer.
After hearing this story, Michael offered to let Mr. Smith hide the box in the new cement being poured in certain apartments. Mr. Smith declined, put the box in his black Corvette, which was spacious enough to fit the box, and drove away. According to Michael, his brother told him that he was taking the box to Hammond, Indiana. Michael said he had not seen the box since.
Michael did not tell anyone about the box until May of 1999 after receiving a non-prosecution agreement and after his grandparents were deceased. In February of 2000, the Wayne County Sheriff's Department sent a letter to Gerry Burman, a Deputy Sheriff with the Newton County Indiana Sheriff's Department, requesting assistance in locating a Jane Doe. From the description, Officer Burman remembered a Jane Doe who was discovered in a plywood box in a very remote area in 1980 by the county's highway department. The box was found on County Road 400 one and a half miles from a major roadway and was approximately forty miles south of Hammond, Indiana. A law enforcement officer on the scene in 1980 stated that various items of clothing and a quilt were packed into and around the box. Photographs, which were admitted into evidence, corroborate this testimony. The condition of the grass where the box rested suggested that it had been in that location for a significant period of time.
Officer Burman assisted in exhuming the remains in March of 2000. The remains in the box were eventually identified as being Janice's. No cause of death, however, could be determined. Dr. Steven A. Symes, a forensic anthropologist, explained that, if the trauma, for instance a bullet, does not directly impact the bones it does not show up on the skeletal remains. Dr. Symes also testified that Janice's lower legs were sawed off postmortem, mostly likely with a serrated knife.
In March of 2000, a cadaver dog, Eagle, searched the Chaney garage. According to Eagle's handler, Sandra Anderson, Eagle alerted that the odor of human remains was present where the box had first been located according to Michael but did not alert to the alleged second location of the box.
In 1999, Michael agreed to have his telephone conversations with Mr. Smith recorded while cooperating with law enforcement. During these conversations, audiotapes of which were played for the jury, Mr. Smith can be heard explaining that someone, as a practical joke, put a goat in the box and that the box was not anywhere near Seville, Ohio. In a telephone conversation on July 22, 1999, Michael lied to Mr. Smith, telling him that he was supposed to testify before a grand jury on August 5, 1999. After that telephone call, Mr. Smith disappeared for a few days. According to Trevor Alfred Haywood, Mr. Smith's coworker in Escondido, California, Mr. Smith did not initially report for work on August 5, 1999. Mr. Haywood testified that this was unusual because of Mr. Smith's good work habits.
At trial, Michael admitted that he had told various individuals different stories about where Janice's body was buried over the years. On cross-examination, the defense exposed the fact that, once Michael had decided to cooperate, he was inconsistent as to certain details of his story.
Special Agent Robert Hilland of the FBI testified that, in early 1998, he received a written request from the West Windsor Police Department, requesting assistance in investigating Janice's disappearance. Representatives of several law enforcement agencies in several states participated in the investigation. According to Special Agent Hilland, after generating new intelligence, law enforcement officials began conducting interviews nationwide on May 5, 1999. On that day, Mr. Smith, along with several other individuals, was interviewed. During the interview, Mr. Smith denied knowing what happened to Janice. When told that, during an interview in 1992, Kathy Paridon, contrary to her initial story, had said that there was no other occupant in the vehicle when Janice gave her a ride home on November 17, 1974, Mr. Smith responded that Ms. Paridon was lying.
According to Agent Hilland, when he started talking about Michael, Mr. Smith began to cry. Agent Hilland again asked about Mr. Smith's involvement in Janice's disappearance and opined that Mr. Smith was responsible. According to Agent Hilland, at that point, Mr. Smith, who was very emotional, began saying that he did not want to lie anymore, that he did not know how to begin talking about it, and that he was scared. Mr. Smith also kept saying that his life was a nightmare, which he was tired of living. Afterwards, Mr. Smith complained of feeling unwell, and the interview was eventually concluded.
As previously mentioned, Mr. Smith reported that Janice had been wearing her diamond watch the last time he saw her. Kathleen McDonald, a close friend of Mr. Smith's, testified that, in 1978, she shared with Mr. Smith her desire to buy a green watch, which she had seen advertised. According to Kathleen McDonald, Mr. Smith told her not to buy the watch and gave her a watch with a jewel beveled "J" and diamonds. Mr. Smith told her that it had belonged to his wife, who had died. The watch was admitted into evidence.
Scott Mintier, Mr. Smith's coworker at the Pullman Standard Company in Hammond, Indiana, identified the same exhibit, as the watch he had seen Mr. Smith wearing in 1977. On cross-examination, Scott Mintier admitted that he had given a slightly different description of the watch in July of 1999 but affirmed that the watch in the exhibit was the same watch he had seen Mr. Smith wearing in 1977.
Lodema Hartman ("Lodema"), Janice's younger sister, was twelve years old in 1972. She testified that she had helped Mr. Smith buy a green watch for Janice. She stated that the watch previously identified by Kathleen McDonald and Mr. Mintier looked like the watch that Mr. Smith had purchased Janice. Lodema also testified that she saw her sister at their mother's house in the fall of 1974. During that visit, for reasons unknown to Lodema, she and Janice swapped clothing. According to Lodema, just before leaving, Janice hugged her and whispered that she would see her at her graduation. Lodema's graduation, however, was four years away.
Additionally, evidence adduced at trial demonstrated that Mr. Smith had explained Janice's disappearance differently to various individuals over the years. Detective Michael Dansbury of the West Windsor Township New Jersey Police Department testified that he met with Mr. Smith on October 16, 1991. According to Detective Dansbury, during their conversation, Mr. Smith told him that he last saw Janice heading toward Florida to join a commune and that he had not seen or heard from her since. Mr. Smith denied filing a missing person report for Janice until Detective Dansbury told him that he had a copy of the report.
Dennis Evans, a long time friend of Mr. Smith's, testified that Mr. Smith had told him that Janice had left because she was testifying in a drug case.
Sandi Norwood Haynesworth, another close friend of Mr. Smith's, testified that, in 1975, Mr. Smith told her that he married Janice right out of high school and loved her very much, but that she began using drugs and hanging around rough people, so they mutually agreed to end their marriage. According to Sandi Haynesworth, Mr. Smith related that drug dealers had murdered Janice because she owed them money. Mr. Smith said that he received a telephone call from the murderers telling him to go to a particular location and that, when he went there, he saw Janice's dead body and retrieved her wedding rings. When asked, Mr. Smith stated that he did not call the police because he was afraid they would kill him.
Janice Miller, Mr. Smith's girlfriend in Connecticut in 1992, testified that she was a prostitute and a drug user to whom Mr. Smith gave money to buy drugs. After approximately one month of dating Mr. Smith, Janice Miller moved in with him. She related that she canceled a trip to Atlanta with Mr. Smith when he told her that Janice was a drug addict who was killed by a drug dealer because she was a drug informant. He related that a FBI agent gave him this information. According to Janice Miller, Mr. Smith maintained that he never saw Janice's body. Janice Miller testified that her relationship with Mr. Smith ended because he would not give her any more money and she thought he was stealing her clothing.
Sheila Sautter testified that she met Mr. Smith at work in the early 1980's in Connecticut, and they dated for approximately seven and one half years. While they lived together, Sheila Sautter discovered Mr. Smith's old resume, which indicated that Mr. Smith was divorced with no children. Up until that point, Sheila Sautter believed that Mr. Smith was single. When she confronted Mr. Smith, he denied having been married and blamed the inaccuracies on his resume as being a secretary's typographical error. However, when pressed, Mr. Smith stated that he was married for a very short time just after high school and that eventually he and Janice went on their separate ways.
In April of 1992, law enforcement officers asked Sheila Sautter to record a telephone conversation with Mr. Smith. An audiotape of the conversation was played for the jury and admitted into evidence. During the conversation, Mr. Smith denied any knowledge that Janice had been missing for all of the years. Later, Mr. Smith admitted that he had been lying to everyone, but it is unclear exactly what Mr. Smith admitted he was lying about.
Summer McGowin testified that her mother, Diane Susan Bertalan, married Mr. Smith in September of 1998. Summer McGowin related that, on July 24, 1999, she and her mother asked Mr. Smith about the box. According to Summer McGowin, Mr. Smith responded that someone dropped the box off on the front porch of his grandfather's residence and that his brother informed him that a dead female was inside. Mr. Smith stated that he did not look inside of the box and disposed of it by dumping it on the side of a farm road. Summer McGowin testified that, approximately two weeks later, she asked Mr. Smith if he killed Janice and that Mr. Smith did not answer her question. Summer McGowin also related that, after Mr. Smith was served with annulment papers, she went to be with her mother because her mother was scared.
Diane Bertalan generally confirmed her daughter's version of events. Diane Bertalan, however, testified that Mr. Smith had indicated that a dead goat was inside of the box, not a dead girl as her daughter had testified. Diane Bertalan added that she filed a missing person report listing Mr. Smith as missing when he disappeared on the evening of July 22, 1999. Mr. Smith, however, returned on July 24, 1999.
The defense presented the testimony of Leonard Bennett, Janice's date when she was attacked on November 10, 1974. He corroborated Janice's version of the events of that night and testified that Janice was afraid of certain people in the Doylestown area.
Construing the evidence most strongly in favor of the prosecution, as we must do in reviewing the sufficiency of the evidence, we find that reasonable minds could find beyond a reasonable doubt all of the essential elements of murder, including the corpus delicti of murder. Consequently, the trial court did not err in overruling Mr. Smith's Crim.R. 29(A) motion for acquittal. Mr. Smith's sixth and ninth assignments of error are overruled.
 B. First Assignment of Error "DUE TO THE JURY'S CONSIDERATION OF INADMISSIBLE EVIDENCE DURING DELIBERATIONS, THE TRIAL COURT'S DENIAL OF APPELLANT SMITH'S NEW TRIAL MOTION VIOLATED HIS RIGHTS TO DUE PROCESS, FAIR TRIAL, AND THE PRESUMPTION OF INNOCENCE." FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION; CRIM.R. 33."
In his first assignment of error, Mr. Smith contends that the trial court abused its discretion in denying his motion for a new trial. Specifically, Mr. Smith avers that evidence previously ruled to be inadmissible, namely evidence regarding the disappearance of Mr. Smith's second wife (the "New Jersey Evidence"), which appeared in State's Exhibit 48, constituted an irregularity in the proceedings which prevented him from having a fair trial. See Crim.R. 33(A)(1). We disagree.
Crim.R. 33(A)(1) provides that a new trial may be granted on motion of the defendant if there was an irregularity in the proceedings which prevented the defendant from having a fair trial. Crim.R. 33(E)(3), however, provides that a new trial shall not be granted because of the admission of evidence against the defendant unless the defendant was prejudiced by the admission. A motion for a new trial pursuant to Crim.R. 33 is addressed to the sound discretion of the trial court. State v.Schiebel (1990), 55 Ohio St.3d 71, paragraph one of the syllabus. Accordingly, a trial court's ruling on such motion will not be disturbed absent an abuse of discretion. Id. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. State v. Clark (1994), 71 Ohio St.3d 466, 470,1994-Ohio-43.
In the present case, prior to trial, the trial court ruled that the New Jersey Evidence was inadmissible under Evid.R. 404(B). The trial court held: "[h]ere, we don't know the circumstances under which Fran Smith's death occurred. There are certainly some similar circumstances surrounding the disappearance of the defendant's first two wives. But the court finds lacking the substantial proof required before it can admit this evidence." Accordingly, at trial, the state did not elicit any oral testimony regarding the New Jersey Evidence. State's Exhibit 48, however, contained a reference to the New Jersey Evidence.
State's Exhibit 48 was the seven page written statement that Michael, the defendant's brother, made to police on May 29, 1999. The vast majority of the document concerned the disappearance of Janice, but, on the bottom of page six and the top of page seven, the law enforcement officer conducting the interview asked Michael the following questions regarding the New Jersey Evidence:
"Q: Did you ever know or meet Betty Fran Smith?
"A: No. 
 "Q: Did John [Smith] ever discuss Betty Fran's disappearance with you?
 "A: Yes. He told me that she left a note and never came back. One day I got a phone call from John between Thanksgiving and Christmas of 1991. John told me that he was married, his wife was missing, and that the police from New Jersey would be coming to talk to me. John also told me to tell my grandparents. * * * I was shocked because John had just been home for Thanksgiving holiday with Sheila. When John had called me that was the first time I ever knew he was married again, and the first time I ever heard of Fran."
According to Mr. Smith, defense counsel inadvertently failed to object to the admission into evidence of this portion of State's Exhibit 48. Consequently, State's Exhibit 48, including those portions dealing with the New Jersey Evidence, was transferred to the jury room when the jury retired to deliberate. Following the jury's verdict, the trial court recessed and went to thank the jurors for their service and to inform them about sentencing. The trial court mentioned to the jurors that a relative of Mr. Smith's second wife might make remarks at sentencing and added that there was an order prohibiting any testimony about the second wife's disappearance. At that point, one of the jurors informed the trial court that State's Exhibit 48 made reference to the disappearance of Mr. Smith's second wife. While the trial court was reviewing the exhibit, one of the jurors told the judge that the jurors did not consider it. During a brief hearing on July 19, 2001, the trial court related these events to counsel for both parties.
Based on the foregoing, Mr. Smith argues that he was denied a fair trial due to the jury's review of "highly prejudicial, inflammatory, inadmissible information" for which neither a cautionary nor a curative instruction was given. The specific references to the New Jersey Evidence in State's Exhibit 48, however, neither were prejudicial nor deprived Mr. Smith of a fair trial. Specifically, in his written statement, Michael merely related that Mr. Smith informed him that in late 1991 his wife, Betty Fran Smith, had left him a note, did not return, and was missing. According to Michael, Mr. Smith also said that the New Jersey police would be coming to speak with Michael. Significantly, the written statement did not contain the highly prejudicial information regarding Betty Fran Smith's disappearance, which was presented at the pretrial hearing concerning the admissibility of the New Jersey Evidence under Evid.R. 404(B). Moreover, one of the jurors related that the jurors did not consider this information in reaching their verdict.[1]
Accordingly, based upon a careful review of the record, we cannot say that, under these circumstances, the trial court abused its discretion in finding that the specific reference to the New Jersey Evidence in State's Exhibit 48 did not constitute an irregularity of proceedings, which denied Mr. Smith a fair trial.
In addition, Mr. Smith essentially contends that the trial court erred in refusing to grant him a new trial because the trial court did not hold an evidentiary hearing, pursuant to the seminal case Remmer v.United States (1954), 347 U.S. 227, 98 L.Ed. 654, to examine the possible prejudicial effect that this information had on the jurors' verdict. We disagree with Mr. Smith's assertion.
Following Remmer, the Ohio Supreme Court has held that, when a trial court learns about an improper outside communication with a juror, the court must hold a hearing to determine whether the communication biased the juror. State v. Phillips (1995), 74 Ohio St.3d 72, 88, citingRemmer, 347 U.S. at 229-30. The present case, however, does not involve an allegation of an improper outside communication or influence on the jurors; rather, State's Exhibit 48, which albeit contained a reference to evidence previously deemed inadmissible by the court, had been available for inspection by the defense and was admitted into evidence without objection. This exhibit, along with the other exhibits admitted into evidence, was given to the jury to consider during its deliberations. As the present case does not involve an improper outside communication or influence on the jury, a Remmer hearing was not warranted.
For similar reasons, Mr. Smith's reliance upon United States v. Walker
(C.A.6, 1993), 1 F.3d 423, is misplaced. In Walker, videotape depositions with certain inadmissible portions deleted were played for the jury. Id. at 426. For the parties' convenience, transcripts of the videotape depositions had been prepared, and the portions of the deposition testimony ruled to be inadmissible were highlighted in the transcripts. Id. The transcripts of these depositions were not admitted into evidence; however, they were inadvertently sent to the jury room along with the admitted exhibits during the jury's deliberations. Id. at 426-27. The Sixth Circuit Court of Appeals held that the defendants were denied a fair trial when the trial court denied their request to have aRemmer hearing held, thereby preventing them from meeting their burden of proving actual juror bias. Id. at 431.
The present case is clearly distinguishable from Walker in that the materials sent to the jury room in the case sub judice were contained in an exhibit admitted without an objection by the defense. Although the exhibit contained reference to information previously deemed inadmissible by the court, the inclusion of such information in a properly admitted exhibit cannot be considered an outside influence on the jury, thereby requiring a Remmer hearing. Based on the foregoing, we hold that the trial court did not abuse its discretion in denying Mr. Smith's Crim.R. 33(A)(1) motion. Mr. Smith's first assignment of error is overruled.
 C. Fourth Assignment of Error "THE TRIAL COURT ERRED WHEN IT ADMITTED INADMISSIBLE LAY OPINION TESTIMONY ON THE ISSUE OF APPELLANT SMITH'S GUILT, VIOLATING EVID.R. 701 AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
In his fourth assignment of error, Mr. Smith argues that, in contravention of Evid.R. 701, the trial court admitted into evidence impermissible lay opinion testimony as to his guilt. For the reasons that follow, we disagree.
Opinion testimony "is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704. Such testimony, however, must be "otherwise admissible[.]" Evid.R. 704. Therefore, Evid.R. 704 must be read in conjunction with Evid.R. 701 and 702. State v. Rakes (Dec. 30, 1997), 3rd Dist. No. 11-97-9; State v.Poling (May 17, 1991), 11th Dist. No. 88-T-4112. Evid.R. 701 governs opinion testimony by lay witnesses and limits lay opinion testimony to "opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."
On appeal, Mr. Smith has pointed to a portion of State's Exhibit 48, in which Michael stated that he believed his brother, Mr. Smith, killed Janice and that he had no doubt that Mr. Smith was responsible for Janice's death and ultimate disposal of her body. Mr. Smith argues that this lay opinion testimony was inadmissible under Evid.R. 701, and thus Evid.R. 704, because it was not rationally based on Michael's perceptions.
Mr. Smith failed to object to the admission of this evidence at trial and, therefore, has waived all but plain error. State v. McKee,91 Ohio St.3d 292, 294, 2001-Ohio-41 (writing that "[e]rrors that arise during a trial that are not brought to the attention of the court are ordinarily waived and may not be raised on appeal unless there is plain error, i.e., but for the error, the outcome of the trial clearly would have been otherwise"); see, also, Crim.R. 52(B). After a careful review of the record, we cannot say that, but for the alleged error in the admission of this evidence, "the outcome of the trial clearly would have been otherwise." McKee, 91 Ohio St.3d at 294. Accordingly, Mr. Smith's fourth assignment of error is overruled.
 D. Fifth Assignment of Error "THE COURT ERRED WHEN IT ADMITTED EXPERT TESTIMONY ABOUT A CANINE "SEARCH" OF THE CHANEY GARAGE WHICH WAS NOT RELIABLE UNDER EVID.R.702, AND WITHOUT A CAUTIONARY JURY INSTRUCTION IN VIOLATION OF THE FIFTH
AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION; SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION."
In his fifth assignment of error, Mr. Smith contends that the trial court abused its discretion in admitting the testimony about a canine search of the Chaney garage by the cadaver or decomposition dog, Eagle, over his objection, because such testimony was unreliable under Evid.R. 702 and was admitted without a cautionary instruction. We disagree.
The admission of evidence is within the sound discretion of the trial court, and a decision on the admission of such evidence will not be disturbed absent an abuse of discretion. State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus. An abuse of discretion connotes an unreasonable, arbitrary, or unconscionable attitude. Clark,71 Ohio St.3d at 470.
Assuming, without deciding, that it was error to admit testimony regarding the results of Eagle's search, we nevertheless find that such error was harmless. See Crim.R. 52(A). At trial, Sandra Anderson, Eagle's handler, testified that Eagle searched the Chaney garage in March of 2000. Ms. Anderson related that Eagle indicated that the odor of human remains was present against the cinder block wall in the north part of the east wall of the garage. Thus, Eagle had alerted that the odor of human remains was present in the same area where, according to Michael's testimony, the box was first situated in the garage. Eagle, therefore, partially corroborated the testimony of Michael.
Michael, however, had also testified that, at some point, the box was moved to a different area in the garage. Eagle did not indicate in that area. Ms. Anderson explained that actual decomposition needed to be occurring in that place for Eagle to detect an odor of human remains, implicitly suggesting that Janice's body may have fully decomposed by the time the box was moved to the second location in the garage.
A videotape of Eagle's search was played for the jury. In the videotape, Eagle can be seen definitively alerting to the area of the garage where the box was allegedly first located. Additionally, despite being repeatedly shown the alleged second location of the box, Eagle did not alert to that location.
On appeal, Mr. Smith has argued that, because Eagle corroborated the testimony of Michael, the only witness who directly linked Mr. Smith to Janice's remains, the admission of the evidence regarding Eagle's search was highly prejudicial. Michael's testimony, however, was independently corroborated by other more compelling evidence. Significantly, in Michael's May 29, 1999 statement to police, Michael described in detail the box, which he had seen Mr. Smith building in 1974 and in which he had discovered a human skeleton with the legs sawed off slightly below the knee in 1979. Michael stated that, after discovering the remains, he immediately called his brother and informed him that he had opened the box. That night, Mr. Smith drove from Hammond, Indiana to Seville, Ohio and picked up the box. Michael related that he had not seen the box since.
In 1980, workers for the Newton County Highway Department discovered a box of the same description in a ditch located in a rural area just forty miles south of Hammond, Indiana, where Mr. Smith was living in 1979. The box contained a skeleton of a human female that had the portion of legs just below the knee missing. The identity of the remains was unknown to Indiana law enforcement officials, until Deputy Sheriff Gerry Burman received a letter in February of 2000 from the Wayne County Sheriff's Office requesting assistance in locating a Jane Doe. From the description of the Jane Doe, Deputy Sheriff Burman remembered the human remains that had been found in a box in 1980 and informed those individuals investigating Janice's disappearance. These remains were eventually identified as Janice's. Accordingly, shortly after Michael made law enforcement officials aware of the box and its contents for the first time, the box was located and Janice's remains identified. Additional evidence corroborating Michael's testimony was also presented at trial.
Therefore, as the evidence regarding the results of Eagle's search was merely cumulative of more compelling evidence corroborating Michael's testimony, the admission of such evidence was not prejudicial. See Crim.R. 52(A). In addition, regarding Mr. Smith's assertion that the trial court committed reversible error in failing to give a cautionary instruction, Mr. Smith has not pointed to and we can find no portion of the record demonstrating that Mr. Smith requested such an instruction; therefore, Mr. Smith has waived any error regarding the omission of a cautionary instruction.[2] See, generally, State v. Sanders,92 Ohio St.3d 245, 249, 2001-Ohio-189; App.R. 16(A)(7). Furthermore, we note that, in its charge to the jury, the trial court gave a general instruction regarding expert testimony, which included an instruction on determining the weight and credibility to give expert testimony. Accordingly, Mr. Smith's fifth assignment of error is overruled.
 E. Seventh Assignment of Error "THIS CONVICTION VIOLATES THE CONSTITUTIONAL RIGHTS TO PRESENT A DEFENSE, TO A FAIR TRIAL, AND TO CONFRONT." FIFTH, SIXTH, FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16, OHIO CONSTITUTION."
In his seventh assignment of error, Mr. Smith avers that he was deprived of a fair trial when the trial court refused to allow defense counsel to elicit testimony from Leonard Bennett, Janice's companion when she was attacked and threatened on November 10, 1974, regarding: 1) whether Janice had ever indicated that she was afraid of anyone and 2) whether Janice had ever said she might disappear. We disagree.
As set forth above, the admission or exclusion of evidence rests within the sound discretion of the trial court, and a ruling on such matters will not be overturned absent an abuse of discretion. Sage, 31 Ohio St.3d at paragraph two of the syllabus. First, contrary to Mr. Smith's assertion, the trial court allowed Leonard Bennett to testify that Janice had expressed fear of certain people in the Doylestown area and that she had never told him why she was afraid of those people.[3] As such, we can discern no error on this matter.
Second, Mr. Smith contends that the trial court denied him a fair trial by refusing to allow him to elicit testimony on whether Janice had ever said she might disappear. Specifically, Mr. Smith objects to the following colloquy:
"Q[:] Did she ever tell you that she might disappear?
"A[:] Yes.
"[The prosecutor]: Objection.
"THE COURT: Sustained.
 "[Defense counsel]: Your Honor, I do believe it comes under an exception.
 "THE COURT: Well, I want more time period and circumstances surrounding the statement."
Clearly, the trial court sustained the state's objection on the basis that Mr. Smith had not laid a proper foundation for the question. Despite being given the opportunity to clarify the time period and circumstances surrounding the statement that Janice thought she might disappear, Mr. Smith chose not to pursue the matter. Accordingly, we find that, as the trial court did not refuse to allow Mr. Smith to elicit testimony on this matter but, rather, merely required him to lay a foundation for its admission, the trial court committed no error. Mr. Smith's seventh assignment of error is overruled.
 F. Second Assignment of Error "THE TRIAL COURT PREJUDICIALLY ERRED BY ADMITTING IRRELEVANT CHARACTER AND PRIOR ACTS EVIDENCE IN THE STATE'S CASE IN CHIEF IN VIOLATION OF EVID.R.402-405 AND R.C. 2945.59, AND APPELLANT'S RIGHTS TO DUE PROCESS AND TO FAIR TRIAL. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTION 10, OHIO CONSTITUTION."
In his second assignment of error, Mr. Smith contends that the trial court abused its discretion in admitting highly prejudicial character and other acts evidence in contravention of Evid.R. 404 and R.C. 2945.59, thereby violating his rights to due process and a fair trial. We disagree.
Generally, relevant evidence is admissible. Evid.R. 402. Relevant evidence, however, must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Additionally, subject to certain enumerated exceptions, character evidence is not admissible for the purpose of proving that an accused acted in conformity therewith on a particular occasion. Evid.R. 404(A). Similarly, pursuant to Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." See R.C.2945.59.
 Plain Error Analysis
Mr. Smith argues that the trial court committed reversible error in allowing the state to present highly prejudicial, irrelevant character and other acts evidence, which painted Mr. Smith as a "creep" with a bad temper who used and stalked women. He specifically, in list format, assigns error to the admission of the following evidence: 1) Sandi Haynesworth testifying that Mr. Smith was a "very high-strung type person" who "seemed to be troubled sometimes, sometimes anxious[;]" 2) Betty Lippincott testifying to an episode during which Mr. Smith "flared up like a firecracker and pounded [her] cupboard, stomped his foot and [said], [d]on't you people know how to fix anything else but soup and sandwiches[;]" 3) Gary Hartman testifying that, when he went to visit Janice in Columbus, there was a "domineering kind of situation" when Mr. Smith was present; 4) Gary testifying as to an episode during which Mr. Smith had thrown a chess board against the wall when he lost a game of chess to Gary; 5) Summer McGowin testifying that, in December of 1999, after Mr. Smith was served with annulment papers, she went to be with her mother because her mother was scared; 6) Sandi Haynesworth testifying that she and Mr. Smith had discussed getting married in order to help his career; 7) Richard Gromlovits testifying that Mr. Smith followed Kathleen McDonald around "like a puppy dog[;]" 8) Janice Miller testifying that she cancelled a trip to Atlanta with Mr. Smith because she became nervous when Mr. Smith told her that Janice was a drug informant and had been killed by drug dealers; 9) Janice Miller testifying that she thought Mr. Smith was surreptitiously taking her clothing; and 10) Janice Miller testifying that she felt that Mr. Smith sometimes spoke to her as if he were talking to someone else.
At trial, Mr. Smith did not object to the admission of the above evidence. "Errors that arise during a trial that are not brought to the attention of the court are ordinarily waived and may not be raised on appeal unless there is plain error, i.e., but for the error, the outcome of the trial clearly would have been otherwise." McKee,91 Ohio St.3d at 294; see, also, Crim.R. 52(B). Accordingly, as Mr. Smith failed to object to the admission of this evidence at trial, he has waived all but plain error on appeal. After a thorough review of the record, we cannot say that the admission of this evidence rose to the level of plain error, when considered individually or in the aggregate.
 Abuse of Discretion Analysis
In addition, Mr. Smith argues that the trial court abused its discretion in allowing the state to present certain impermissible character or other acts evidence over his timely objections. We disagree.
As previously discussed, the admission or exclusion of evidence rests within the sound discretion of the trial court. Sage, 31 Ohio St.3d at paragraph two of the syllabus. A trial court's decision on such matters will not be overturned absent an abuse of discretion. Id. An abuse of discretion connotes an unreasonable, arbitrary, or unconscionable attitude. Clark, 71 Ohio St.3d at 470.
First, Mr. Smith contends that Sheila Sautter's testimony that she agreed to record a telephone conversation with Mr. Smith, during which she vigorously questioned him about Janice's disappearance and during which Sheila Sautter purportedly referred to a second missing wife, constituted inadmissible character or other acts evidence. The telephone conversation, an audiotape of which was played for the jury, contained highly relevant evidence concerning Mr. Smith's knowledge of Janice's disappearance or Mr. Smith's decision to give a different account of her disappearance. It also contained Mr. Smith's admission that he was lying to everyone. Furthermore, the alleged reference to the disappearance of Betty Fran Smith, when Sheila Sautter asked during the conversation, "[b]ut what about that, even the one in Ohio, I mean, Janet [sic.]," was so obscure that it could have been interpreted by the jury as not even being a reference to Betty Fran's disappearance. Accordingly, we cannot find that the trial court abused its discretion in admitting such evidence. Moreover, even if it were error, we find it to be harmless. Crim.R. 52(A).
Additionally, Mr. Smith avers that the trial court abused its discretion in admitting over his timely objection Janice Miller's testimony that she was a prostitute to whom Mr. Smith gave money to buy drugs.[4] Mr. Smith essentially contends that this evidence tended to portray him as a "creep" who used women. Assuming, without deciding, that it was error to admit this evidence, we find that Mr. Smith suffered no prejudice as a result. Mr. Smith's second assignment of error is overruled.
 G. Eighth Assignment of Error "APPELLANT SMITH WAS DEPRIVED OF A FAIR TRIAL BASED ON THE EGREGIOUS, PERVASIVE PROSECUTORIAL MISCONDUCT THAT OCCURRED, IN CONTRAVENING HIS RIGHTS TO DUE PROCESS AND FAIR TRIAL. FIFTH, SIXTH FOURTEENTH AMENDMENTS, U.S. CONSTITUTION; SECTION 16, ARTICLE I, OHIO CONSTITUTION."
In his eighth assignment of error, Mr. Smith asserts that he was denied a fair trial when the prosecutor: 1) improperly commented on Mr. Smith's failure to testify; 2) argued facts not in evidence; and 3) highlighted numerous items of allegedly inadmissible character and other acts evidence. We disagree.
"`[T]he touchstone of due-process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.'" State v. Hill (1996), 75 Ohio St.3d 195, 203, quoting Smith v. Phillips (1982), 455 U.S. 209, 219, 71 L.Ed.2d 78. "[W]ide latitude is given to counsel during closing argument to present their most convincing positions." State v. Phillips (1995),74 Ohio St.3d 72, 90, 1995-Ohio-171. When prosecutorial misconduct is alleged, an appellate court must determine whether the remarks were improper and, if so, whether the remarks prejudicially affected the substantive rights of the defendant. Id., citing State v. Smith (1984),14 Ohio St.3d 13, 14. Significantly, prosecutorial misconduct is not grounds for error unless the defendant has been denied a fair trial.State v. Maurer (1984), 15 Ohio St.3d 239, 266.
Mr. Smith first argues that, during closing arguments, the prosecutor impermissibly remarked on his decision not to testify and assert his innocence when the prosecutor stated: "[o]nly two people know exactly what happened to Jan, and Jan is dead." We note that Mr. Smith failed to object at trial regarding this alleged prosecutorial misconduct and, therefore, has waived all but plain error. See State v. Twyford (2002),94 Ohio St.3d 340, 355, 2002-Ohio-894.
It is well-settled that a prosecutor may not comment on a defendant's failure to testify. Id. In determining whether a defendant'sFifth Amendment rights were violated, this court must consider "`whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" (Citations omitted.) Id. Significantly, isolated remarks by a prosecutor should not be taken out of context and given their most damaging interpretation. Id. at 356.
In the present case, we cannot say that the above comment was manifestly intended or was of such character that the jury would have taken it to be a comment on Mr. Smith's failure to testify or assert his innocence. In fact, the prosecutor could have made the same comment even if Mr. Smith had testified on his own behalf, as it did not reference, either explicitly or implicitly, Mr. Smith's decision not to testify. Furthermore, even if it were an improper comment, we cannot say that the remark prejudicially affected the substantive rights of Mr. Smith.
Mr. Smith next asserts that the prosecutor improperly argued facts not in evidence when the prosecutor argued in rebuttal that Janice was killed when Mr. Smith pulled her green nightgown over her head. We disagree. In the portions of the closing argument to which Mr. Smith has objected, the prosecutor was attempting to rebut the defense's contention that Janice was killed by drug dealers because she was a police informant.
The prosecutor argued that the evidence showed that Janice was not killed by strangers, i.e. the drug dealers, but, rather, by someone very close to her because Janice was wearing her nightgown when she was killed. There was some evidence, albeit slight, upon which such an argument could be based. Specifically, a green article of clothing was admitted into evidence. A photograph, admitted into evidence, shows Janice's remains wrapped in a blanket, and, beneath the blanket, a green item of clothing can be seen. Additionally, in the photograph, Janice's skull also appears to be partially discolored by green. This discoloration is consistent with Dr. Saul's report, in which he wrote that several of Janice's bones were partially stained green, probably from the dye of clothing in the box with her.
Thus, the jury could review this evidence and decide for itself whether the prosecutor's argument had merit, specifically whether Janice was wearing a green nightgown that had been pulled over her head on the night she died. Considering the fact that a prosecutor is given wide latitude in closing argument and there was some evidence that could arguably support the prosecutor's contentions, we cannot find that the prosecutor's remarks were improper. Further, even if we were to assume that the prosecutor's comments were improper, we cannot say that they prejudicially affected Mr. Smith's substantive rights.
Lastly, Mr. Smith contends that the prosecutor committed prosecutorial misconduct by highlighting numerous items of allegedly inadmissible character and other acts evidence. Mr. Smith failed to object at trial regarding this alleged prosecutorial misconduct and, therefore, has waived all but plain error. See Twyford, 94 Ohio St.3d at 355. It is well-established that a prosecutor has wide latitude during closing argument to present his or her most convincing position based on the evidence presented at trial. See Phillips, 74 Ohio St.3d at 90. Here, Mr. Smith has requested that this court find that, under the specific circumstances of this case, the prosecutor acted improperly by making arguments based upon evidence admitted at trial. We decline to do so. Accordingly, we find that the prosecutor did not engage in prosecutorial misconduct in this regard.
Based on the foregoing, we cannot conclude that the prosecutor made improper comments during closing arguments. Further, even if the prosecutor's comments were improper, we cannot say that, when viewed individually or in the aggregate, the remarks prejudicially affected the substantive rights of Mr. Smith. Mr. Smith's eighth assignment of error is overruled.
 H. Third Assignment of Error "APPELLANT SMITH WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL. SIXTH AND FOURTEENTH AMENDMENTS, U.S. CONSTITUTION; ARTICLE I, SECTIONS 10
AND 16, OHIO CONSTITUTION."
In his third assignment of error, Mr. Smith avers that he was denied the effective assistance of trial counsel. We disagree.
A two-step process is employed in determining whether the right to effective counsel has been violated:
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington (1984), 466 U.S. 668, 687, 80 L.Ed.2d 674, 693.
In demonstrating prejudice, the defendant must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989),42 Ohio St.3d 136, paragraph three of the syllabus. In addition, the court must evaluate "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690, 80 L.Ed.2d at 695. The defendant has the burden of proof, and must overcome the strong presumption that counsel's performance was adequate and that counsel's action might be sound trial strategy. State v. Smith (1985), 17 Ohio St.3d 98, 100. Furthermore, an attorney properly licensed in Ohio is presumed competent. State v. Lott (1990), 51 Ohio St.3d 160, 174.
Mr. Smith argues that he was denied the effective assistance of counsel when his trial counsel: 1) failed to object to State's Exhibit 48; 2) failed to object to certain allegedly impermissible other acts and character evidence; 3) failed to object to various instances of prosecutorial misconduct; 4) failed to object to the lack of proper foundation for the testimony of Eagle's handler, Sandra Anderson; and 5) failed to request a cautionary instruction regarding Sandra Anderson's testimony. These errors were raised in the above assignments of error. Assuming, without deciding, that trial counsel's performance was deficient, we cannot find that there is a reasonable probability that, were it not for these alleged errors, the result of the trial would have been different. See Bradley, 42 Ohio St.3d at paragraph three of the syllabus.
Mr. Smith also avers that his trial counsel was ineffective because counsel failed to move for a change of venue due to extensive media coverage and because counsel failed to challenge for cause jurors who were allegedly biased due to their knowledge of the case. We find that these arguments lack merit.
The decision to exclude a juror for bias or grant a change in venue rests largely within the discretion of the trial court. State v. White
(1998), 82 Ohio St.3d 16, 20, 25. Regarding whether pretrial publicity prejudices the jury, the Ohio Supreme Court has written:
"It is rare for a court to presume that a jury is prejudiced by pretrial publicity. Moreover, the fact that prospective jurors have been exposed to pretrial publicity does not, in and of itself, demonstrate prejudice. `Pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial.' Therefore, if `the record on voir dire establishes that prospective veniremen have been exposed to pretrial publicity but, affirmed they would judge the defendant solely on the law and the evidence presented at trial, it is not error to empanel such veniremen.' * * * `[A] careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.'" (Citations omitted.) Id. at 21.
Here, the voir dire of potential jurors covered over 200 pages of trial transcript. Defense counsel actively participated in the voir dire process, asking questions designed to ascertain what each juror had heard or learned about the case. Several jurors, including some who were eventually empanelled, were familiar with the case and remembered hearing something about a second missing or murdered wife. The trial court and counsel for both sides asked prospective jurors whether they could be fair to Mr. Smith and decide the case based upon the evidence presented during trial. The empanelled jurors responded in the affirmative. In light of the foregoing, we cannot conclude that trial counsel's performance was deficient in not challenging for cause certain jurors and for not moving for a change of venue. Even if trial counsel's performance was deficient in this regard, these alleged errors, when considered alone or together with the other alleged instances of ineffective assistance of counsel, cannot be said to have prejudiced Mr. Smith. Mr. Smith's third assignment of error is overruled.
 III.
Mr. Smith's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.
BAIRD, P.J., CARR, J. CONCUR.
[1] To support his contention that a new trial should have been granted, Mr. Smith cited to a newspaper article, in which a juror told the press that, although the jury decided to disregard the New Jersey Evidence contained in State's Exhibit 48, knowing about the disappearance of Mr. Smith's second wife may have made a guilty verdict easier to consider.
[2] Mr. Smith contended that a cautionary instruction was particularly important in the present case because Sandra Anderson referred to Eagle as extremely honest and always accurate. Mr. Smith asserted that these statements improperly bolstered the evidence regarding Eagle's search. This testimony, however, could also have had the opposite effect. Furthermore, the statements about Eagle's "honesty," when viewed in context, clearly reveal that Sandra Anderson meant to imply that Eagle was accurate and reliable.
[3] Pursuant to a timely objection by the state, the trial court refused, on hearsay grounds, to allow Mr. Bennett to answer a question regarding whether he remembered any of their names. Mr. Smith, however, has not assigned error to this ruling on appeal.
[4] In his appellate brief, Mr. Smith points to other portions of Janice Miller's testimony and argues that the admission of such evidence was error. Those other portions of Janice Miller's testimony, however, were elicited during cross-examination. Therefore, he has waived any error in their admission.